Joel E. Elkins (SBN 256020)
jelkins@weisslawllp.com
**WEISS LAW**
611 Wilshire Blvd., Suite 808
Los Angeles, CA 90017
Telephone: (310) 208-2800
Facsimile: (310) 209-2348

*Counsel for Plaintiff*

[Additional Counsel in Signature Block]

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| STEPHEN BUSHANSKY, derivatively on behalf of Nominal Defendant GOODRX HOLDINGS, INC., <br><br> Plaintiff, <br><br> vs. <br><br> DOUGLAS HIRSCH, TREVOR BEZDEK, CHRISTOPHER ADAMS, JULIE BRADLEY, DIPANJAN DEB, ADAM KAROL, JACQUELINE KOSECOFF, STEPHEN LESIEUR, GREGORY MONDRE, AGNES REY-GIRAUD, KELLY J. KENNEDY, and KARSTEN VOERMANN, <br><br> Defendants, <br><br> and <br><br> GOODRX HOLDINGS, INC., <br><br> Nominal Defendant. | Civil Action No. <br><br> **VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT** <br><br> **DEMAND FOR JURY TRIAL** |

Plaintiff Stephen Bushansky ("Plaintiff"), by the undersigned attorneys, brings this stockholder derivative action on behalf of nominal defendant GoodRx Holdings, Inc. ("GoodRx" or the "Company") against certain current and former directors and officers for their breaches of fiduciary duties, violations of the federal securities laws, and other misconduct that resulted in

1

material damage to the Company and its stockholders. These allegations are made upon personal knowledge with respect to Plaintiff and, as to all other matters, upon information and belief based upon the investigation and analysis by Plaintiff's counsel, including, among other things, a review of the Company's press releases and public filings with the United States Securities and Exchange Commission ("SEC"), corporate governance documents published on the Company's website, a review of the securities class action complaint filed against the Company and its officers and directors, transcripts of GoodRx conference calls with financial analysts and investors, news reports, financial analyst reports, and other publicly available information about the Company. Plaintiff believes that substantial additional evidentiary support will exist for the allegations after a reasonable opportunity for discovery.

## I.    NATURE OF THE ACTION

1.     This is a stockholder derivative action brought against certain current and former GoodRx directors and officers for their breaches of fiduciary duties and violations of the federal securities laws, as well as other misconduct, which resulted in substantial damage to the Company and its stockholders.

2.     GoodRx operates a platform that enables consumers to compare prescription medication prices, offering access to discounted medications through the use of codes and coupons. GoodRx's discount program is free for members on its site. The Company's platform is designed to serve both insured and uninsured consumers.

3.     The majority of GoodRx's revenue is derived from agreements with pharmacy benefit managers (PBMs), who negotiate discounted prescription pricing from pharmacies, which they provide to GoodRx's members. PBMs are paid by the pharmacy for each discounted prescription dispensed to consumers according to a specific arrangement between the pharmacy and the PBM. GoodRx's platform connects consumers to PBM pricing through a comparison tool, listing discounted drug prices at nearby locations and providing a GoodRx code that the consumer can then use to obtain the drug at the discounted price listed. In essence, some of the revenues earned by the

PBMs are passed on to GoodRx to pay for the exposure and upsell of the discounted prices to GoodRx members. Additionally, GoodRx earns revenue through subscription services such as the "Kroger Rx Savings Club," which allows members to benefit from reduced prescription prices at The Kroger Company ("Kroger") pharmacies.

4.     GoodRx went public in September 2020. In the lead up to the offering and thereafter, GoodRx, its directors and officers repeatedly omitted any dependence on revenue derived from Kroger or the revenue GoodRx earned from the purchase of discounted prescriptions at the various pharmacies who were collaborating with the PBMs. The Company and its directors and officers also falsely represented that its discounted codes were accepted at every major retail pharmacy location in the United States within its network, while in reality, GoodRx only had agreements with the PBMs to obtain the discounted pricing lists for various locations but had not secured direct agreements with the pharmacies to ensure that the GoodRx members could take advantage of the discounted prices. Further, it was concealed that when the agreement with Kroger to establish the Kroger Savings Club was formed, that agreement did not ensure that Kroger would accept GoodRx discount codes from consumers who joined the club.

5.     On May 10, 2022, the Company disclosed in a Quarterly Report on Form 10-Q filed with the SEC that an unnamed grocery chain (later revealed to be Kroger) had taken actions which "impacted acceptance of discount pricing for a subset of drugs," which, as was revealed on an earnings call later that day, translated into an impact on almost a quarter of the Company's prescription transaction revenue. Six months later, the Company disclosed that the impact of the "grocer issue" was between $45 to $50 million in lost revenue, leading the Company to report only $187.3 million in revenue for the third quarter 2022. Moreover, it was admitted that the representations regarding an agreement with Kroger for a discount club for consumers were materially misleading in that Kroger retained the right to unilaterally refuse to accept GoodRx discounts to consumers enrolled in the club.

6.      In the wake of these disclosures, the Company's stock dropped by 22% in one day and securities class action lawsuits began to be filed against the Company, former Co-CEOs Douglas Hirsch ("Hirsch") and Trevor Bezdek ("Bezdek"), and CFO Karsten Voermann ("Voermann"). As such, the Company is now subject to substantial liability and will be forced to expend substantial sums to defend itself, as well as its directors and officers.

7.      During the time that the Company's stock was inflated due to the false and misleading statements and material omissions disseminated regarding the Company's financial condition and business prospects, the Individual Defendants, in breach of their fiduciary duties, caused GoodRx to repurchase more than eight million shares of its Class A commons stock at inflated prices for over $100 million. Virtually simultaneously, Hirsch, Bezdek, another director, and CFO Voermann, while in possession of material non-public information regarding the Company's true financial condition and business prospects, were selling their own GoodRx shares into the market, reaping more than $54 million in proceeds.

8.      As a result of the Individual Defendants' breaches of fiduciary duty and other misconduct, GoodRx has been substantially damaged and its reputation irreparably harmed. Through this action, Plaintiff seeks to recover for the Company its damages from those responsible and remediate the internal control weaknesses that afflict GoodRx.

9.      Plaintiff did not make a demand prior to bringing this action because it would be futile. The Company's directors are neither disinterested nor independent. In the absence of this action, GoodRx will neither recover its damages nor properly remediate the weaknesses in its internal controls and corporate governance practices and procedures.

## II.    JURISDICTION AND VENUE

10.      This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Sections 14(a) and 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rules 14a-9 (17 C.F.R. § 240.14a-9) and 10b-5

promulgated thereunder, and for contribution pursuant to Section 21D of the Exchange Act. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

11. This Court has jurisdiction over each Defendant named herein because GoodRx maintains its headquarters and does substantial business in this District and, as such, each Defendant is an individual or corporation who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District Court permissible under traditional notions of fair play and substantial justice.

12. This action is not a collusive one to confer jurisdiction on a court of the United States that it would not otherwise have.

13. Venue is proper in this District pursuant to § 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1931(b), where the Company maintains its headquarters and where it conducts substantial business.

## III. PARTIES

### A. Plaintiff

14. Plaintiff Stephen Bushansky purchased GoodRx stock in the Company's Initial Public Offering ("IPO") and has held GoodRx common stock continuously since that time. As such, Plaintiff was a shareholder at the time of the transactions complained of herein.

### B. Defendants

#### 1. Nominal Defendant GoodRx

15. GoodRx is a Delaware corporation with its principal executive offices located at 2701 Olympic Boulevard, Santa Monica, CA 94040. GoodRx shares trade on the Nasdaq stock market ("Nasdaq") under the ticker symbol "GDRX."

#### 2. Individual Defendants

16. Defendant Douglas Hirsch ("Hirsch") is a co-founder of GoodRx and has served as a director since the Company's inception in September 2011, and as Chief Mission Officer ("CMO") since April 2023. Previously, Hirsch was a Chief Executive Officer of the Company from September

2011 to April 2023. Hirsch was designated to the Board by Idea Men, LLC ("Idea Men"), a holding company that is controlled by Defendant Hirsch, Defendant Trevor Bezdek, and co-founder Scott Marlette, which controls 17.3% of the Company's voting power as of April 8, 2024. Since 2021, Hirsch received the following compensation:

| YEAR | SALARY | NON-EQUITY INCENTIVE PLAN COMPENSATION | ALL OTHER COMPENSATION | TOTAL |
|------|--------|----------------------------------------|------------------------|-------|
| 2023 | $500,00 | $269,120 | $15,736 | $784,856 |
| 2022 | $500,000 | N/A | $7,290 | $507,290 |
| 2021 | $500,000 | $357,176 | $21,928 | $879,104 |

17.    Defendant Trevor Bezdek ("Bezdek") is a Co-founder of GoodRx and has served as a director since the Company's inception in September 2011, Chairman of the Board since April 2023, and a member of the Nominating and Corporate Governance Committee. Previously, Bezdek was a Co-Chief Executive Officer and the Secretary of the Company from January 2015 to April 2023. Bezdek was designated to the Board by Idea Men. Since 2021, Bezdek received the following compensation:

| YEAR | SALARY | BONUS | NON-EQUITY INCENTIVE PLAN COMPENSATION | ALL OTHER COMPENSATION | TOTAL |
|------|--------|-------|----------------------------------------|------------------------|-------|
| 2023 | $500,00 | $250 | $269,120 | $42,158 | $811,528 |
| 2022 | $500,000 | $571 | N/A | $36,434 | $537,005 |
| 2021 | $428,000 | $334 | $357,176 | $34,171 | $891,681 |

18.    Defendant Christopher Adams ("Adams") is a GoodRx director since October 2015 and Chair of the Nominating and Corporate Governance Committee and a member of the Compensation Committee. Adams is a Partner at Francisco Partners Management, L.P. ("Francisco Partners"), a global investment firm that specializes in partnering with technology and technology enabled businesses, where he has served since August 2008. Francisco Partners and its affiliates control 24.1% of the Company's voting power as of April 8, 2024. Adams was designated to the Board by Francisco Partners.

19.    Defendant Julie Bradley ("Bradley") is a GoodRx director since August 2020 and Chair of the Audit and Risk Committee. Since 2021, Bradley received the following compensation:

| YEAR | FEES EARNED OR PAID IN CASH | STOCK AWARDS | TOTAL |
|---|---|---|---|
| 2024 | $50,000 | $222,525 | $272,525 |
| 2023 | $50,000 | $160,798 | $210,798 |
| 2022 | $50,000 | $227,536 | $277,536 |
| 2021 | $5,707 | $742,500 | $748,027 |

20.     Defendant Dipanjan Deb ("Deb") is a GoodRx director since October 2015. Deb is a co-founder of Francisco Partners and has served as the Managing Partner and Chief Executive Officer of Francisco Partners since September 2005. Deb was designated to the Board by Francisco Partners.

21.     Defendant Gregory Mondre ("Mondre") is a GoodRx director since October 2018 and is Chair of the Compensation Committee. Mondre is Co-Chief Executive Officer and Managing Partner at Silver Lake Technology Management, L.L.C. ("Silver Lake"), a global technology investment firm. He joined Silver Lake in 1999 and most recently served as a Managing Partner and Managing Director of the firm from January 2013 to December 2019. Silver Lake and its affiliates control 43.5% of the Company's voting power as of April 8, 2024.  Mondre was designated to the Board by Silver Lake.

22.     Defendant Agnes Rey-Giraud ("Rey-Giraud") is a GoodRx director since October 2016 and is a member of the Audit and Risk Committee. Rey-Giraud was designated to the Board by Silver Lake. Since 2021, Rey-Giraud received the following compensation:

| YEAR | FEES EARNED OR PAID IN CASH | STOCK AWARDS | OPTION AWARDS | TOTAL |
|---|---|---|---|---|
| 2024 | $47,000 | $222,525 | N/A | $269,525 |
| 2023 | $47,000 | $160,798 | N/A | $207,798 |
| 2022 | $48,663 | $227,536 | N/A | $276,199 |
| 2021 | $21,359 | N/A | $97,242 | $118,601 |

23.     Defendant Kelly J. Kennedy ("Kennedy") is a GoodRx director since December 2023. In 2023, Kennedy received $448,634 in stock awards from the Company.

24.     Defendant Adam Karol ("Karol") served as a GoodRx director from 2018 until his resignation on March 22, 2024. Karol also served on the Compliance Committee.

25.     Defendant Jacqueline Kosecoff ("Kosecoff") served as a GoodRx director from 2016 until her resignation on June 30, 2023. Since 2021, Kosecoff received the following compensation:

| YEAR | FEES EARNED OR PAID IN CASH | OPTIONS AWARDS | TOTAL |
|---|---|---|---|
| 2023 | $45,000 | $160,798 | $205,798 |
| 2022 | $39,467 | $227,536 | $267,003 |
| 2021 | $25,242 | $96,600 | $121,842 |

26.     Defendant Stephen LeSieur ("LeSieur") served as a GoodRx director from 2015 until his resignation on March 14, 2024. He also served on the Compliance Committee and the Nominating and Corporate Governance Committee. LeSieur shares voting and dispositive power over the shares held by Spectrum Equity VII, L.P. ("Spectrum") and its affiliates, which control 10.3% of the Company's voting power as of April 8, 2024.

27.     Defendant Voermann is GoodRx's CFO since March 2020. Since 2021, Voermann received the following compensation:

| YEAR | SALARY | BONUS | STOCK AWARDS | ALL OTHER COMPENSATION | TOTAL[1] |
|---|---|---|---|---|---|
| 2023 | $450,000 | $163,105 | N/A | $46,929 | $902,242 |
| 2022 | $439,000 | $205,395 | $4,541,371 | $49,294 | $5,235,060 |
| 2021 | $428,000 | $250.00 | N/A | $997.00 | $520,970 |

28.     Defendants Hirsch, Bezdek, Adams, Bradley, Deb, Karol, Kosecoff, Lesieur, Mondre, Rey-Giraud, Kennedy, and Voermann are collectively referred to as the "Individual Defendants."

## IV.    THE INDIVIDUAL DEFENDANTS' DUTIES

29.     By reason of their positions as officers or directors of GoodRx and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed and owe GoodRx and its shareholders, fiduciary obligations of loyalty, good faith, due care, and candor, and were and are required to use their utmost ability to control, manage, and oversee GoodRx in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of GoodRx and its shareholders to benefit all shareholders equally and not in furtherance of their own personal interests or benefit.

---

[1] Includes Non-Equity Plan Compensation of $91,723 and $242,208 received in 2021 and 2023, respectively.

8

30.     The Individual Defendants, because of their positions of control and authority as directors and officers of GoodRx, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

31.     As officers and directors of a publicly traded company whose common stock was registered with the SEC and trades on the Nasdaq, the Individual Defendants also owed a duty to ensure the dissemination of accurate, complete, and truthful information concerning GoodRx's financial condition, operations, products, internal controls, and business prospects. In addition, the Individual Defendants had a duty to cause the Company to disclose in its regulatory filings with the SEC all material facts so that the market price of the Company's shares would be based upon accurate information. In order to meet these duties, the Individual Defendants were required to exercise reasonable control and supervision over GoodRx's management, policies, and internal controls.

32.     At all times relevant hereto, the Individual Defendants were the agents of each other and GoodRx and were always acting within the course and scope of such agency.

33.     The Individual Defendants were and are also subject to particularized duties pursuant to specific policies in effect at GoodRx.

**A.  Additional Duties Under GoodRx's Code Of Conduct**

34.     GoodRx's Code of Business Conduct and Ethics ("Code of Conduct") applies to directors, officers and employees of GoodRx.

35.     The Code of Conduct requires all directors, officers and employees to report any potential violations of the Code of Conduct to either the General Counsel or their immediate supervisor.

36.     The Code of Conduct obligates honest and ethical conduct and fair dealing: "All employees should endeavor to deal fairly with fellow employees and with the Company's collaborators, licensors, customers, suppliers and competitors. Employees should not take unfair advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation of material facts or any other unfair-dealing practice."

37.     The Code of Conduct prohibits insider trading while in possession of material non-public information:

> Consistent with the Company's Insider Trading Compliance Policy, the Company's employees and directors are prohibited from trading in the stock or other securities of the Company while in possession of material nonpublic information about the Company. In addition, Company employees and directors are prohibited from recommending, "tipping" or suggesting that anyone else buy or sell the Company's stock or other securities on the basis of material non-public information….Violation of insider trading laws can result in severe fines and criminal penalties, as well as disciplinary action by the Company, up to and including, for an employee, termination of employment or, for a director, a request that such director resign from the Board of Directors. You are required to read carefully and observe our Insider Trading Compliance Policy, as amended from time to time. Please contact the Company's General Counsel for a copy of the Insider Trading Compliance Policy or with any questions you may have about insider trading laws.

38.     The Code of Conduct requires that all books, records and accounts of GoodRx should accurately and fairly reflect all business transactions. The Code of Conduct mandates:

> Accurate and reliable records are crucial to our business. Our records are the basis of our earnings statements, financial reports, regulatory submissions and many other aspects of our business and guide our business decision-making and strategic planning. Company records include financial records, personnel records, records relating to our technology and product development, customer collaborations, manufacturing and regulatory submissions and all other records maintained in the ordinary course of our business.

> All Company records must be complete, accurate and reliable in all material respects. Each employee and director must follow any formal document retention policy of the Company with respect to Company records within such employee's or director's control. Please contact your supervisor or the Company's General Counsel to obtain a copy of any such policy or with any questions concerning any such policy.

39.     The Code of Conduct requires accurate and complete disclosure of information regarding the Company's business, financial condition, and results of operations:

> As a public company we are subject to various securities laws, regulations and reporting obligations. Both federal law and our policies require the disclosure of accurate and complete information regarding the Company's business, financial condition and results of operations. Inaccurate, incomplete or untimely reporting will not be tolerated and can severely damage the Company and result in legal liability.

> The Company's principal financial officers and other employees working in the finance department have a special responsibility to ensure that all of our financial disclosures are full, fair, accurate, timely and understandable. These employees must understand and strictly comply with generally accepted accounting principles and all standards, laws and regulations for accounting and financial reporting of transactions, estimates and forecast.

**B. Additional Duties Of Audit And Risk Committee Members**

40.    The Audit and Risk Committee Charter sets forth additional duties for members of the Audit and Risk Committee and provides that members are obligated to assist the Board in its oversight of, among other things, internal audit, financial reporting and legal matters; the integrity of the Company's financial statements; and the Company's compliance with legal and regulatory requirements.

41.    The Audit and Risk Committee members are required to, among other things:

- Pre-approve any audit and non-audit service provided to the Company by the independent auditor, unless the engagement is entered into pursuant to appropriate preapproval policies established by the Committee or if such service falls within available exceptions under SEC rules;

- Obtain and review, at least annually, a report from the independent auditor describing (a) the auditing firm's internal quality-control procedure and (b) any material issues raised by the most recent internal quality-control review or peer review of the auditing firm, or by any inquiry or investigation by governmental or professional authorities within the preceding five years relating to any independent audit conducted by the auditing firm, and any steps taken to deal with any such issues. The Committee shall also confirm the regular rotation of the lead audit partner and reviewing partner of the independent auditor as required by law;

- Discuss with the independent auditor any audit problems, financial reporting issues or difficulties in connection with the preparation of the Company's financial statements and management's response;

- Review and discuss the annual audited financial statements with management and the independent auditor, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations";

- Provide the Company with the report of the Committee with respect to the audited financial statements for inclusion in each of the Company's annual proxy statements;

- Review and discuss the quarterly financial statements with management and the independent auditor, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations;"

- Discuss the Company's earnings press releases, as well as financial information and earnings guidance provided to analysts and rating agencies;

- Provide general oversight of the Company's compliance processes and procedures and monitor its performance with respect to the legal and regulatory requirements applicable to the Company's business. While the Committee has the responsibilities and powers set forth in this Charter, the Committee and the Board

11

may rely on the expertise and knowledge of management, including the Company's compliance personnel. The Committee may initiate such compliance investigations as it deems appropriate;

- Review and oversee compliance with federal, state and local program requirements that impact the Company's operations;

- Ensure proper communication of significant regulatory compliance issues to the Board;

- Review significant regulatory compliance risk areas and the steps management has taken to monitor, control and report such compliance risk exposures;

- Review and oversee the Company's compliance program, including monitoring the effectiveness of the compliance program, and recommend to the Company any improvements and changes to the compliance program;

- Meet regularly with the Chief Executive Officer and/or other officers of the Company to assess the Company's regulatory compliance policies and procedures and recommend any improvements or changes to such policies and procedures;

- Review reports of specific material non-compliance issues and approve corrective actions proposed by management;

- Review and assess the development of internal systems and controls to carry out the Company's compliance program and related policies and procedures as part of its daily operations;

- Review and assess strategies to promote compliance with the compliance program and the detection of any possible violations, such as through hotlines and other reporting mechanisms;

- Review and assess, at least annually, the Company's major financial and enterprise risk exposures, including fraud risks, and the steps management has taken to monitor or mitigate such exposures;

- Review and assess the Company's risk exposures in other areas, as the Committee deems necessary or appropriate from time to time;

- Oversee the Company's internal audit function, including its objectives, responsibilities, independence, performance and annual plan and budget. As part of its general oversight responsibilities, the Committee will periodically meet separately with the internal audit function out of the presence of management. The Committee should also review and participate in any process of appointment and/or replacement of the senior employee in charge of the internal audit function;

- Establish procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters, and for the confidential and anonymous submission by Company employees of concerns regarding questionable accounting or auditing matters;

- Review all related person transactions as defined by Item 404 of Regulation S-K on an ongoing basis and all such transactions must be approved or ratified by the

Committee in accordance with the Company's Related Person Transaction Policy and Procedures; and

- Periodically consider and discuss with management and the independent auditor the Company's Code of Business Conduct and Ethics and the procedures in place to enforce the Code.

## V.    SUBSTANTIVE ALLEGATIONS

### A. Background

42.    GoodRx was co-founded in 2011 by Defendants Hirsch and Bezdek. GoodRx offers a platform for consumers to find less expensive prescription medications by offering price comparisons across pharmacies and access to coupons and discounts.

43.    Initially launched as a website, GoodRx aggregated data from multiple sources to provide users with information on drug pricing. Over time, the Company expanded into mobile applications.

44.    GoodRx's business relies upon pharmacies accepting the discount codes offered to GoodRx members. GoodRx members pay for the prescriptions out of pocket at discounted prices, which in many instances are lower than insurance co-pays.

45.    GoodRx's primary source of revenue is its price comparison tool which lets members compare discounted pricing offered by PBMs who have agreements with various pharmacies nationwide and GoodRx is paid a portion from each prescription transaction either in a percentage of the fees that a PBM charges a pharmacy or through a fixed amount per prescription. In each year from 2018 through 2022, GoodRx earned hundreds of millions in prescription transactions revenue[2]:

| Year | Prescription Transactions Revenue | Percentage Of Total Revenue |
|---|---|---|
| 2018 | $242.9 million | 97.4% |
| 2019 | $364.6 million | 93.9% |
| 2020 | $488.3 million | 88.7% |
| 2021 | $593.4 million | 79.6% |
| 2022 | $550.5 million | 71.8% |

---

[2] Data in chart is sourced from the IPO Prospectus and Annual Reports on Form 10-K for 2021 and 2022.

46.     Shortly before the IPO, on its website, GoodRx touted that consumers could save up to 80% on prescriptions "at pharmacies near you with discounts and coupons from GoodRx" and provided a list of major retail pharmacies participating with GoodRx, including CVS, Costco, Rite Aid, and Kroger.

**B. GoodRx's IPO**

47.     On September 25, 2020, GoodRx completed its IPO, issuing 39,807,691 shares of its Class A common stock at a price of $33.00 per share. This offering was made under a registration statement initially filed with the SEC on Form S-1 on August 28, 2020, and subsequently amended through Forms S-1/A on September 14 and 22, 2020, with the final prospectus filed with the SEC on Form 424B4 on September 24, 2020 ("IPO Prospectus"). The IPO Prospectus was incorporated into the registration statement (collectively the "Offering Materials") which was signed by the Individual Defendants. The Offering Materials described a customer's typical "consumer savings process" which involves three simple steps: searching for a prescription, identifying its price, and using GoodRx at the pharmacy to obtain the discounted rate.

**C. The Sponsor Stockholders Control GoodRx**

48.     In connection with the IPO, the Company entered into a Stockholders Agreement with several stockholder entities and their affiliates who held approximately 95.2% of the Company's voting power, as of April 8, 2024, according to the Company's latest proxy statement filed with the SEC on April 25, 2024 (the "2024 Proxy Statement"), to designate certain affiliated directors as nominees to GoodRx's Board. These entities include Silver Lake, Francisco Partners, Idea Men, and Spectrum and their respective affiliates (the "Sponsor Stockholders"). Through this process, Defendants Hirsch, Bezdek, Adams, Deb, Karol, Mondre, Rey-Giraud, and LeSieur, were designated to the Board, by Idea Men, Franscisco Partners, Silver Lake, or Spectrum, respectively. Beyond electing directors who are associated with the Sponsor Stockholders, these entities have the right to elect two directors who are not affiliated with any Sponsor Stockholder (such as Defendant Bradley). Therefore, according to the 2024 Proxy Statement, through the Stockholders Agreement, the Sponsor

Stockholders control the election of directors to the Board and GoodRx is considered a "controlled company" for the purposes of the Nasdaq rules: "Under the Stockholders Agreement, the Sponsor Stockholders have acknowledged and agreed to act as a 'group' within the meaning of the Nasdaq Rules and, as of the date of this proxy statement, the Sponsor Stockholders, in the aggregate, control more than 50% of the voting power for the election of directors." The Proxy further notes:

> [O]ur Nominating and Corporate Governance Committee is not entirely independent in reliance on the controlled company exemption and we rely on certain exemptions to the Nasdaq corporate governance requirements for our Nominating and Corporate Governance Committee. For so long as we remain a "controlled company," we may avail ourselves of other exemptions available to "controlled companies" in the future.

### D. GoodRx, Its Directors And Officers Represent That The Company's Platform Offers Savings to Consumers At Every Major Retail Pharmacy

49.    In the Offering Materials, Defendants Hirsch, Bezdek, Voermann, Adams, Bradley, Deb, Karol, Kosecoff, LeSieur, Mondre, and Rey-Giraud represented that "[c]onsumers can use GoodRx at over 70,000 pharmacies, nearly every retail pharmacy in the United States."

50.    These directors and officers touted the "size and strength" of GoodRx's "Healthcare Partner Network" and stated: "Our proprietary technology platform aggregates data from a variety of different sources on a daily basis to present consumers with curated, geographically relevant prescription pricing that can be used to save money at every major retail pharmacy." Further, they represented that GoodRx's discounted prices "are free to access for consumers by saving a GoodRx code to their mobile device for their selected prescription and presenting it the chosen pharmacy."

51.    The Offering Materials repeatedly referred to the Kroger Savings Club, representing that the Company had a long-standing business relationship with Kroger.

52.    On September 25, 2020, GoodRx completed its IPO, issuing 39,807,691 shares of its Class A common stock at a price of $33.00 per share, reaping proceeds of approximately $1.1 billion.

**E.  After The IPO, GoodRx, Its Directors And Officers Continue To Tout The Company's Relationship With Koger And Growing Prescription Transactions Revenue**

53.     On November 12, 2020, the Company filed with the SEC its Quarterly Report on Form 10-Q for the period ended September 30, 2020. In the 10-Q, which was signed by Defendants Hirsch, Bezdek, and Voermann, the Company disclosed that prescription transactions revenue grew exponentially from the previous quarter, going from $95.7 million the prior year to $124.4 million, a 30% increase year-over-year. The 10-Q also contained a similar statement as the Offering Materials regarding the broad acceptance of GoodRx's discount codes at over "70,000 pharmacies."

54.     On a conference call with financial analysts and investors to discuss the financial results, Defendant Voermann touted the prescription transactions revenue growth and noted that it represented nearly 89% of the Company's total quarterly revenue. Defendant Bezdek emphasized that the Company had closed a multi-year extension to the Kroger Savings Club and highlighted the "fruitful relationship." Bezdek further commented that the Company provided consumers an opportunity to save money on prescriptions "by simply presenting GoodRx at one of the 70,000 pharmacies where GoodRx's accepted."

55.     On November 18, 2020, at the RBC Capital Markets Conference, Defendant Hirsch again emphasized the "70,000 pharmacies where GoodRx is accepted."

56.     On December 10, 2020, at the Barclays Global Technology, Media, and Telecommunications Conference, Defendant Hirsch stated that the process "really is so simple" because consumers only needed to "download our app, you present it at the pharmacy, it works just like a coupon does at the grocery store."

57.     On March 11, 2021, the Company filed with the SEC a Current Report on Form 8-K and attached a letter to shareholders, which was signed by Defendants Hirsch and Bezdek, and reported that prescriptions transactions revenue had grown 26% year-over-year, going from $104.5 million to $131.3 million and representing 86% of all quarterly revenue.

58.     On the same day, during a conference call with financial analysts and investors to discuss the financial results reported for the Company's fourth quarter of 2020, Defendant Bezdek commented that the Company had "helped a record 5.6 million monthly active consumers, saving them prescriptions by using GoodRx at one of our 70,000 participating pharmacies."

59.     On March 12, 2021, the Company filed with the SEC its Annual Report on Form 10-K (the "2020 10-K"), which was signed by the Individual Defendants.  In the 2020 10-K, the Individual Defendants represented that the Company's codes could be used at over "70,000 pharmacies in the United States." These directors and officers also touted the Company's relationship with Kroger "the fourth largest retail pharmacy in the Unites States, to offer a tailored subscription product to Kroger consumers" and the development of the Kroger Rx Savings Club, whose offerings were "a natural extension of our successful prescription offering" and "designed to be easy to use and provide subscribers with added benefits and features."

60.     On May 27, 2021, Good Rx published an article on its website in which the Company stated that pharmacies that are part of the GoodRx network "are **required[3] to accept GoodRx** through contracts with their" PBMs.  The article further stated that the pharmacies on GoodRx's website "belong to the PBM networks that we partner with and are **contractually obligated** to accept GoodRx" and noted that in some instances, "GoodRx also works with pharmacies directly."

61.     On June 17, 2021, at the Cowen Insights/Future Health Conference, Defendant Hirsch discussed how GoodRx provides consumers with information and access to low prescription prices on its platform, including establishing over ten years of "incredible relationships and contracts with all the key stakeholders in healthcare":

> [S]o that was the original quest and it remains so today, which is, how do we get this information? Not only get it, but then clean it up and make it clean, and make it in a way that a consumer could just simply be able to type in the name of a drug and see answers, just like you should at any, I'd say interactive experience. **And so what we've established over 10 years is incredible relationships and contracts with all the key stakeholders in healthcare**.

---

[3] All emphasis herein is added unless otherwise stated.

62.     Hirsch stated that the Company works with "pretty much *every major PBM in the country*, and we continue to add new ones all the time, which ultimately allows us to drive better pricing for consumers." Hirsch then touted the Company's "incredible proprietary technology" that makes it "super simple" for the consumer.

63.     On February 28, 2022, on a conference call with financial analysts and investors to discuss the Company's fourth quarter financial results, Defendant Bezdek represented that the Company's relationships with PBMs "remain great," the Company still had "very good" relationships with pharmacies, and there were no "significant changes or developments" regarding these relationships which would impact the Company's financial condition. Defendant Voermann provided full year 2022 guidance:

> For the full year, we expect revenue to grow about 23%, slightly below our guidance for the first quarter as we lapped 2 small acquisitions we made in the second quarter of 2021 and lap a first half of 2021 that was more heavily affected by COVID, creating slightly higher year-over-year comps as 2022 progresses.
>
> We expect adjusted EBITDA margin to expand sequentially through the year with full year adjusted EBITDA margin landing between 31% and 33% and a fourth quarter margin in excess of 33%. This margin dynamic is related both to our expected revenue growth, the higher margin flow-through from our rapidly growing pharma manufacturer solutions offering and some upfront marketing investments that we are making in the first quarter to maximize in-year return.

64.     On March 1, 2022, the Company filed with the SEC its Annual Report on Form 10-K (the "2021 10-K"), which was signed by all the Individual Defendants. In the 2021 10-K, the Individual Defendants disclosed that the Company's prescription transactions revenue was $594 million for the fiscal year, 80% of the Company's total revenue of $745 million. In the same period, GoodRx's subscription revenue amounted to less than $60 million or less than 8% of total revenue.

65.     The 2021 10-K made the same claims as the 2020 10-K, earlier Quarterly Reports, and the Offering Materials that GoodRx codes "can be used at over 70,00 pharmacies in the United States." The Individual Defendants further represented that the Kroger Rx Savings Club, offered "a tailored subscription product to Kroger consumers."

18

66.    On March 15, 2022, at the Deutsche Bank 30th Annual Media, Internet and Telecom Conference, Defendant Voermann highlighted GoodRx's "deep" and "really strong" relationships with "all of the big pharmacies out there," providing CVS, Rite Aid, and Walmart as examples:

> On the pharmacy side, we have ***deep relationships with all of the big pharmacies out there***, so, some examples of that are that we ran ads in the fall that folks might have seen in collaboration with CVS, that were shot in CVS stores. Obviously, you don't do that unless CVS likes you. We brought Rite Aid onto our Gold platform, our subscription platform. Walmart's running videos for their pharmacists on how to take GoodRx, how to accept GoodRx, which they pay for because they really value the GoodRx users coming into Walmart stores and filling up their basket with a whole bunch of other things. And entities like Costco and we work together on integrations to make the GoodRx flows easier for pharmacists there too, so we feel like our relationships with all the big pharmacies, which is where all the volume flows through, are really strong.

**F. GoodRx Discloses The Tenuous Nature Of The Company's Relationship With Kroger And The Resulting Impact On Its Financial Condition**

67.    On May 9, 2022, the Company held a conference call to discuss its financial results for the Company's first fiscal quarter of 2022. On the call, Defendant Bezdek disclosed that "a grocery chain has taken actions late in the first quarter of 2022 that impacted acceptance of discounted pricing for a subset of drugs from PBMs." Bezdek described that "in April, this dynamic intensified, impacting more drugs and more of the grocer's pharmacies, leading to significant lost volumes and an expected greater impact in our Q2 and full year prescription transactions revenue." However, Bezdek downplayed the impact on GoodRx:

> We are not aware of similar PBM pharmacies issues at this time and believe that the scale of the situation is unique. This is a unique situation because while in the past, the pharmacy has negotiated and changed pricing with 1 or 2 PBMs at a time. In this case, this growth are [sic] negotiated with almost all PBMs at the same time. This effectively meant that all discount pricing became unavailable to consumers at the same time.
>
> The swift action we took in response to this issue, including removing discount prices from our platform for this grocer while PBMs work with this grocer on resolution, protected our new user growth from being impacted. New user counts remain very consistent and pharmacies other than this one grocer had such strong aggregate new user growth momentum. Many of this grocer's competitors saw new user growth rates up over 20% to 30%, offsetting the new user decrease at this growth.

68.     Bezdek noted that "[w]hile this grocer represents less than 5% of the pharmacies in GoodRx network, it made up almost 1/4 of our prescription transaction revenue in the first quarter." Bezdek explained the Company was so dependent on this particular grocer because it was "over indexing relative to market share" due to the nature of their "particularly attractive PBM-negotiated pricing." Voermann later confirmed that the grocer "just blew up all of their contracts [with PBMs] all at once."

69.     Later, on the call, Defendant Voermann walked back the Company's full year 2022 revenue guidance of approximately $916 million given on February 28, 2022 due to the "grocer issue," which would have an estimated revenue impact of approximately $30 million:

> [W]e believe it is unlikely we will be able to achieve the full year 2022 guidance we provided in the fourth quarter earnings call due to the grocer issue we discussed. We will not be providing full year expectations at this time as the full year impact of the grocer issue is difficult to estimate because there are several variables, including, among others, eventual consumer pricing and returning usage levels that have to be determined.

> We expect Q2 2022 revenue to come in at about $190 million. This assumes the grocer issue, which we believe could have an estimated revenue impact of roughly $30 million will be ongoing without amelioration through Q2. At this time, we do not have sufficient data to forecast the trajectory of any amelioration because GoodRx usage there has not stabilized sufficiently to be forecastable.

70.     Voermann also emphasized the impact on prescription transactions revenue: "For the quarter, factoring in no amelioration of the grocer issue, we expect prescription transactions revenue *to decline approximately 8% to 12% year-over-year*."

71.     On May 10, 2022, the Company filed with the SEC its Quarterly Report on Form 10-Q (the "1Q22 10-Q"), which was signed by Defendants Hirsch, Bezdek, and Voermann. In the 1Q22 10-Q, the Company confirmed the actions taken by Kroger without mentioning the pharmacy chain by name:

> [W]e recognized that a grocery chain had taken actions late in the first quarter of 2022 that impacted acceptance of discounted pricing for a subset of drugs from PBMs, who are our customers, and whose pricing we promote on our platform. This had an immaterial adverse impact on our prescription transactions revenue in the first quarter and is expected to have an adverse impact on prescription transactions revenue in the future that may be material. Prescription transactions at this grocer represented a material proportion of our prescription volume and revenue during the three months ended March 31, 2022. We are not aware of similar PBM-pharmacy issues at any other

large volume pharmacies, and with the exception of the grocer in question, we believe our pharmacy and PBM relationships remain strong.

72.    Financial analysts including those from Barclays and Deutsche Bank confirmed that the "grocer issue" involved Kroger, and GoodRx's much-touted Kroger Rx Savings Club. On the news, the Company's stock price fell from a closing price of $10.75 per share on May 9, 2022, to close at $7.97 per share on May 10, 2022, an approximate 25% drop.

73.    On August 8, 2022, on a call with financial analysts and investors to discuss the Company's second quarter financial results, Defendant Bezdek acknowledged that the "grocer issue" was worse than he previously represented on the May 9th earnings call: "We exited the second quarter seeing *approximately 20% of the weekly volume* we processed through this grocer before the issue beginning of March and has seen subsequent continued declines post quarter end." However, Bezdek later stated, that the grocer issue had "been addressed," which was confirmed by Defendant Hirsch: "[T]he grocer issue has been addressed. We have worked collaboratively with the grocer over the last few months to address the situation in a way that allows GoodRx and the grocer to jointly serve consumers in a way that helps consumers and also satisfies the grocer's needs."

74.    On August 9, 2022, the Company filed with the SEC its Quarterly Report on Form 10-K (the "2Q22 10-Q") which was signed by Defendants Hirsch, Bezdek, and Voermann.  In the 10-Q, the Company disclosed that the continuing impact of the grocer issue made future results of its operations and financial condition difficult to estimate:

> The preparation of the condensed consolidated financial statements in conformity with GAAP requires management to make estimates and assumptions that affect the amounts reported in the condensed consolidated financial statements, including the accompanying notes. We base our estimates on historical factors, current circumstances including the impact of a grocery chain not accepting discounted pricing for a subset of drugs from our PBMs ("grocer issue")….The sustained effects of the grocer issue on our business, future results of operations and financial condition continue to be difficult to estimate because there are several variables that are highly uncertain and cannot be predicted including, among others, consumer response to updated consumer pricing and timing and extent of returning user levels that have yet to be determined. As the impact of the grocer issue continues to develop, many of our estimates require increased judgment and carry a higher degree of variability and volatility and may change materially in future periods.

75.    The Company also represented that it expected is discounted pricing to be "consistently welcomed at the point of sale by the grocery chain…."

76.    On November 8, 2022, on a conference call with financial analysts and investors to discuss the Company's third quarter financial results, CFO Voermann reported the Company expected in the fourth quarter "prescription transactions revenue of approximately $125 million to $126 million, which assumes a combined ***$45 million to $50 million estimated impact*** related to the grocer issue and our consumer engagement efforts." Voermann emphasized that the Company would continue to see the impact of the "grocer issue" in the future: "We expect to continue seeing the year-over-year impact of the grocer issue until 3Q 2023 when we left 3Q 2022, which was the first quarter with full impact of the disruption. Our expectation is for a PTR per MAC to continue to modestly decrease quarter-over-quarter until that time, primarily due to an ongoing shift in retailer volume. We expect subscription revenue of approximately $22 million to $23 million, down quarter-over-quarter."

77.    Bezdek disclosed that the Company had lost more than $8 million in prescriptions transaction revenue during the period: "The amount of prescription transactions revenue associated with the grocer decreased from $12.4 million to $4.3 million during th[e] period" and was "still well under the $33.7 million from third quarter 2021." Bezdek further noted the Company's new "hybrid approach" of "*selective* direct contracting with pharmacies," which drove home the tenuous relationships the Company had with pharmacies up until that point:

> Historically, PBMs have contractual agreements with pharmacies and our business model has been tied to contractual agreements with PBMs and their relationships with pharmacies. Today, our approach involves selective direct contracting with pharmacies to complement the continued existing contractual agreements with our PBM customers. We believe our hybrid approach ensures stronger lines of communication and stronger relationships with our retailers.

78.    Following these disclosures, the Company's stock dropped by another 22.5%, falling from a November 8, 2022 closing price of $5.24 per share to $4.06 per share on November 9, 2022.

## G.  GoodRx Is Sued In A Securities Class Action Lawsuit

79.     On April 22, 2024, a securities class action lawsuit was filed in this Court captioned *Barsuli v. GoodRx Holdings, Inc., et al.*, No.2:24-cv-03282-AB-AJR (C.D. Cal.), against the Company, Hirsch, Bezdek, and Voermann. An amended complaint filed on September 20, 2024, alleges violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), Rule 10b-5 promulgated thereunder by the SEC, and Section 20(a) of the Exchange Act. The lawsuit seeks damages on behalf of a class consisting of all persons and entities that purchased or otherwise acquired GoodRx securities between September 23, 2020, and November 8, 2022, inclusive. The lawsuit alleges that the named defendants omitted from their public statements that: (i) consumers could only use GoodRx at pharmacies within GoodRx's network if accepted by the pharmacy at the time of purchase; (ii) the Company had not secured contracts with its largest and most important pharmacies, including Kroger, requiring that GoodRx codes would be accepted; and (iii) the Company was substantially and intentionally overexposed to Kroger, and as a result relied on Kroger prescriptions for nearly a quarter of its prescription transactions revenue, a unique concentration risk that was not previously disclosed.

**H.  Certain Of The Individual Defendants Profit From Insider Sales**

80.     At the time that the Company's stock was inflated from false and misleading statements and/or material omissions, Defendants Hirsch, Bezdek, Rey-Giraud, and Voermann (the "Insider Sales Defendants") sold substantial amounts of their GoodRx shareholdings while in possession of material non-public information, collectively selling more than 1,412,750 GoodRx shares, and reaping more than $54.7 million in illicit proceeds:

- Defendant Hirsch sold 519,190 GoodRx shares, reaping $20,419,378 in proceeds:

| Date | Number of Shares | Price Per Share | Proceeds |
|---|---|---|---|
| 22-Mar-21 | 131,066 | $36.63 | $4,800,410 |
| 23-Jun-21 | 94,615 | $37.90 | $3,585,908 |
| 24-Jun-21 | 34,760 | $38.49 | $1,337,815 |
| 24-Sep-21 | 123,422 | $45.24 | $5,583,611 |
| 27-Sep-21 | 5,952 | $43.26 | $257,483 |
| 15-Dec-21 | 129,375 | $37.52 | $4,854,150 |

- Defendant Bezdek sold 519,190 GoodRx shares, reaping $20,053,364 in proceeds:

| Date | Number of Shares | Price Per Share | Proceeds |
|---|---|---|---|
| 22-Mar-21 | 131,066 | $36.77 | $4,819,296 |
| 23-Jun-21 | 94,855 | $37.90 | $3,595,004 |
| 24-Jun-21 | 34,520 | $38.48 | $1,328,329 |
| 24-Sep-21 | 124,370 | $45.19 | $5,620,280 |
| 27-Sep-21 | 5,004 | $43.27 | $216,523 |
| 22-Dec-21 | 64,271 | $35.19 | $2,261,696 |
| 23-Dec-21 | 65,104 | $33.98 | $2,212,233 |

- Defendant Voermann sold 245,000 GoodRx shares, reaping approximately $9,013,400 in proceeds:

| Date | Number of Shares | Price Per Share | Proceeds |
|---|---|---|---|
| 29-Mar-21 | 150,000 | $37.76 | $5,664,000 |
| 28-Apr-21 | 12,500 | $40.64 | $508,000 |
| 28-May-21 | 12,500 | $38.39 | $479,875 |
| 28-Jul-21 | 12,500 | $32.69 | $408,625 |
| 30-Aug-21 | 12,500 | $37.35 | $466,875 |
| 28-Sep-21 | 7,500 | $40.87 | $306,525 |
| 1-Nov-21 | 12,500 | $22.02 | $275,250 |
| 1-Dec-21 | 12,500 | $39.29 | $491,125 |
| 28-Dec-21 | 12,500 | $33.05 | $413,125 |

- Defendant Rey-Giraud sold 129,370 GoodRx shares, reaping $5,294,565 in proceeds:

| Date | Number of Shares | Price Per Share | Proceeds |
|---|---|---|---|
| 22-Mar-21 | 25,000 | $36.38 | $909,500 |
| 1-Apr-21 | 25,000 | $40.01 | $1,000,250 |
| 7-Sep-21 | 54,370 | $41.56 | $2,259,617 |
| 14-Sep-21 | 14,454 | $45.00 | $650,430 |
| 15-Sep-21 | 4,637 | $45.03 | $208,804 |
| 16-Sep-21 | 5,909 | $45.01 | $265,964 |

**I. The Individual Defendants Cause GoodRx To Repurchase More Than Eight Million Of Its Shares At Inflated Prices**

81.    The Individual Defendants breached their fiduciary duties by causing GoodRx to repurchase its own stock at prices that were artificially inflated due to the misrepresentations alleged

herein. Between March 2022 and September 2022, approximately 8,455,833 shares of GoodRx common stock were repurchased for $101.6 million.

82.    According to the 1Q22 10-Q, between March 1, 2022, and March 31, 2022, the Company purchased 5,637,005 shares of its common stock for approximately $83.76 million at an average price of $14.86 per shares.

83.    According to the 3Q22 10-Q, between September 1, 2022, and September 30, 2022, the Company purchased 2,818,828 shares of its common stock for approximately $17.95 million at an average price of $6.37 per share.

84.    The prices at which GoodRx was caused by the Individual Defendants to repurchase its common stock were artificially inflated by the false and misleading statements and material omissions described herein, causing substantial damages to the Company and its shareholders.

**J.    GoodRx's False And Misleading Proxy Statements**

85.    On May 1, 2023, the Company filed its 2023 Proxy Statement with the SEC soliciting shareholder votes to, among other things, re-elect Defendants Bradley, Deb, LeSieur, and Mondre to the Board and approve executive compensation. The Proxy Statement was authorized by the Board and signed by Defendant Bezdek.

86.    The 2023 Proxy Statement represents that the Board oversees and monitors the Company's risk exposures: "Risk assessment and oversight are an integral part of our governance and management processes. [O]ur Board and its committees have an active role in overseeing management of the Company's risks. Our Board regularly reviews information regarding the Company's credit, liquidity and operations, as well as the risks associated with each…. Our Board is also apprised of particular risk management matters in connection with its general oversight role and approval of corporate matters and significant transactions."

87.    The 2023 Proxy Statement represents that the Audit and Risk Committee is engaged in vigorous oversight over risks to the Company: "Our Audit [and Risk] Committee is responsible for overseeing our risk management process and the implementation of risk mitigation strategies by

management. Additionally, our Audit [and Risk] Committee is responsible for discussing our general risk assessment and risk management policies and strategy as well as the most significant risks facing us, including financial and cybersecurity risks."

88.     The foregoing statements in the 2023 Proxy Statement were false and misleading and omitted material information. Contrary to the representations made in the Proxy Statement, the Board was required, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing GoodRx's core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects; (2) effectively oversee and monitor the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls.

89.     On June 16, 2023, GoodRx filed with the SEC a Current Report on Form 8-K announcing, among other things, the re-election of Defendants Bradley, Deb, LeSieur, and Mondre to the Board and the approval of executive compensation pursuant to the solicitations in the 2023 Proxy Statement.

90.     On April 25, 2024, the Company filed its 2024 Proxy Statement with the SEC soliciting shareholder votes to, among other things, re-elect Defendants Hirsch and Rey-Giraud to the Board and approve executive compensation. The Proxy Statement was authorized by the Board and signed by Defendant Bezdek.

91.     The 2024 Proxy Statement contained substantially similar statements to the 2023 Proxy Statement regarding the Board's oversight and monitoring of the Company's risk exposures and the robust oversight of the Audit and Risk Committee.

92.     On June 7, 2024, GoodRx filed with the SEC a Current Report on Form 8-K announcing, among other things, the re-election of Defendants Hirsch and Rey-Giraud to the Board and the approval of executive compensation pursuant to the solicitations in the 2024 Proxy Statement.

## VI.    DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

93.    Plaintiff brings this action derivatively and for the benefit of GoodRx to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and officers of GoodRx and violations of Sections 14(a) and 10(b) of the Exchange Act, and SEC Rules 14a-9 (17 C.F.R. § 240.14a-9) and 10b-5 promulgated thereunder, and to seek contribution for violations of Section 21D of the Exchange Act, as well as the aiding and abetting thereof.

94.    GoodRx is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

95.    Plaintiff is, and has been at all relevant times, a stockholder of GoodRx and was a stockholder of the Company at the time of the misconduct alleged herein. Plaintiff will adequately and fairly represent the interests of GoodRx in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to prosecute this action.

96.    Demand upon the Board to institute this action against the Individual Defendants would be futile and is, therefore, excused.  The Board is neither disinterested nor independent.

### A.  Demand Upon Defendant Hirsch Is Excused

97.    Hirsch is a Co-founder of GoodRx and has served as director since the Company's inception in September 2011 and as CMO since April 2023. Previously, Hirsch was a Chief Executive Officer of the Company from September 2011 to April 2023. Hirsch therefore is not independent. As an employee of GoodRx, the Company provides Defendant Hirsch with his principal occupation from which he receives substantial compensation. In 2021, 2022, and 2023, Defendant Hirsch received total compensation packages of $879,104, $507,290 and $784,856, respectively. Indeed, GoodRx's 2024 Proxy Statement does not list Hirsch as an independent director.

98.    Defendant Hirsch had a powerful incentive to inflate GoodRx's stock price through false and misleading financial information in order to profit from insider sales. Defendant Hirsch sold 519,190 GoodRx shares while in possession of material adverse non-public information, reaping

proceeds of $20,419,378. Thus, through the material misrepresentations and omissions regarding GoodRx's business and financial condition, Hirsch reaped a material personal benefit not shared with other GoodRx stockholders.

99.    Hirsch authorized the 2023 and 2024 Proxy Statements containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

100.    Hirsch benefitted from the violation of Section 14(a) of the Exchange Act pled herein by securing re-election to the GoodRx Board through the false and misleading statements and material omissions in the 2024 Proxy Statement.

101.    Defendants Hirsch, Bezdek, Adams, Deb, and Rey-Giraud have a long-standing business relationship which precludes them from acting with the required independence and disinterest with respect to considering whether to institute lawsuits against each other. These directors have served on the GoodRx Board together for close to a decade, and in the case of Hirsch and Bezdek, since GoodRx's inception in 2011.

102.    Defendants Hirsch and Bezdek have long-standing personal and business relationships which preclude them from acting with the required independence and disinterest with respect to considering whether to institute lawsuits against each other. Hirsch and Bezdek have been good friends since as far back as 2010. Indeed, according to a *CNBC* article, Hirsch's and Bezdek's mothers had known each other for years in Los Angeles and encouraged their entrepreneurial sons to work together.[4] Hirsch and Bezdek co-founded the Company together and previously served as co-CEOs during the time of the misconduct alleged herein. At the time of the Company's IPO, Hirsch described GoodRx's co-CEO structure as "the greatest gift I've ever had as a human being…." Hirsch explained that he and Bezdek "are joined at the hip with … two brains in one, we are a left brain and a right

---

[4]  *CNBC*, June 2020, https://www.spectrumequity.com/news/cnbc-how-goodrx-built-a-28-billion-business-by-helping-consumers-find-drug-discounts.

brain."[5] Further, Hirsch and Bezdek control Idea Men, LLC with cofounder Scott Marlette, which controls 17.3% of the Company's voting power as of April 8, 2024.

103.    Hirsch, as a director of GoodRx, was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing GoodRx's core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects; (2) effectively oversee and monitor the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls.

104.    Hirsch is neither independent nor disinterested.  Any demand upon Defendant Hirsch is futile and, thus, excused.

**B.  Demand Upon Defendant Bezdek Is Excused**

105.    Bezdek is a Co-founder of GoodRx and has served as director since the Company's inception in September 2011, Chairman of the Board since April 2023, and a member of the Nominating and Corporate Governance Committee. Previously, Bezdek was a Co-Chief Executive Officer and the Secretary of the Company from January 2015 to April 2023. Bezdek therefore is not independent. As an employee of GoodRx, the Company provided Defendant Bezdek with his principal occupation from which he received substantial compensation. In 2021, 2022, and 2023, Defendant Bezdek received total compensation packages of $891,681, $537,005 and $811,528, respectively. Indeed, GoodRx's 2024 Proxy Statement does not list Bezdek as an independent director.

106.    Defendant Bezdek had a powerful incentive to inflate GoodRx's stock price through false and misleading financial information in order to profit from insider sales. Defendant Bezdek sold 519,190 GoodRx shares while in possession of material adverse non-public information, reaping proceeds of $20,053,364. Thus, through the material misrepresentations and omissions regarding

---

[5]  https://www.businessinsider.com/goodrx-co-ceos-douglas-hirsch-trevor-bezdek-stakes-worth-ipo-2020-9.

GoodRx's business and financial condition, Bezdek reaped a material personal benefit not shared with other GoodRx stockholders.

107.    Defendants Hirsch, Bezdek, Adams, Deb, and Rey-Giraud have a long-standing business relationship which precludes them from acting with the required independence and disinterest with respect to considering whether to institute lawsuits against each other. These directors have served on the GoodRx Board together for close to a decade, and in the case of Hirsch and Bezdek, since GoodRx's inception in 2011.

108.    Defendants Hirsch and Bezdek have long-standing personal and business relationships which preclude them from acting with the required independence and disinterest with respect to considering whether to institute lawsuits against each other. Hirsch and Bezdek have been good friends since as far back as 2010. Indeed, according to a CNBC article, Hirsch's and Bezdek's mothers had known each other for years in Los Angeles and encouraged their entrepreneurial sons to work together. Hirsch and Bezdek co-founded the Company together and previously served as co-CEOs during the time of the misconduct alleged herein. At the time of the Company's IPO, Hirsch described GoodRx's co-CEO structure as "the greatest gift I've ever had as a human being…." Hirsch explained that he and Bezdek "are joined at the hip with … two brains in one, we are a left brain and a right brain." Further, Hirsch and Bezdek control Idea Men, LLC with cofounder Scott Marlette, which controls 17.3% of the Company's voting power as of April 8, 2024.

109.    Bezdek authorized the 2023 and 2024 Proxy Statements containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

110.    Bezdek, as a director of GoodRx, was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing GoodRx's core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects; (2) effectively oversee and monitor the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls.

111.    Bezdek is neither independent nor disinterested. Any demand upon Defendant Bezdek is futile and, thus, excused.

**C.  Demand Upon Defendant Adams Is Excused**

112.    Defendants Hirsch, Bezdek, Adams, Deb, and Rey-Giraud have a long-standing business relationship which precludes them from acting with the required independence and disinterest with respect to considering whether to institute lawsuits against each other. These directors have served on the GoodRx Board together for close to a decade, and in the case of Hirsch and Bezdek, since GoodRx's inception in 2011.

113.    Adams authorized the 2023 and 2024 Proxy Statements containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

114.    Adams, as Chair of the Nominating and Corporate Governance Committee, had the duty, among others, to ensure the implementation and effectiveness of GoodRx's Code of Conduct and Corporate Governance Guidelines. Adams utterly failed to perform these duties.

115.    Defendants Adams and Deb have a long-standing business relationship which precludes them from acting with the required independence and disinterest with respect to considering whether to institute lawsuits against each other. Since 2008, Adams is a Partner at Francisco Partners Management, L.P. ("Francisco Partners"), a global investment firm that specializes in partnering with technology and technology enabled businesses. Defendant Deb is a co-founder of Francisco Partners and has served as the Managing Partner and Chief Executive Officer of Francisco Partners since September 2005. Deb has also served as a Partner of Francisco Partners since its founding in August 1999. Francisco Partners and its affiliates control 24.1% of the Company's voting power as of April 8, 2024. Both Adams and Deb were designated to the Board by Francisco Partners.

116.    Adams, as a director of GoodRx, was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing GoodRx's core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects; (2)

effectively oversee and monitor the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls.

117.    Adams is neither independent nor disinterested.  Any demand upon Defendant Adams is futile and, thus, excused.

**D.  Demand Upon Defendant Bradley Is Excused**

118.    Defendant Bradley was nominated to the Board by Defendant Karol and through the Stockholders Agreement by Silver Lake, where Defendant Mondre is Co-Chief Executive Officer and Managing Partner. As such, Bradley is precluded from acting with the required independence and disinterest with respect to considering whether to institute lawsuits against Defendants Mondre and Karol.

119.    Bradley authorized the 2023 and 2024 Proxy Statements containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

120.    Bradley benefitted from the violation of Section 14(a) of the Exchange Act pled herein by securing re-election to the GoodRx Board through the false and misleading statements and material omissions in the 2023 Proxy Statement.

121.    Bradley, as Chair of the Audit and Risk Committee, had duties regarding oversight of the risks facing the Company and GoodRx's compliance with relevant laws, rules, and regulations. Bradley utterly failed to perform these essential duties.

122.    Bradley, as a director of GoodRx, was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing GoodRx's core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects; (2) effectively oversee and monitor the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls.

123.    Bradley is neither independent nor disinterested.  Any demand upon Defendant Bradley is futile and, thus, excused.

**E.  Demand Upon Defendant Deb Is Excused**

124.    Defendants Hirsch, Bezdek, Adams, Deb, and Rey-Giraud have a long-standing business relationship which precludes them from acting with the required independence and disinterest with respect to considering whether to institute lawsuits against each other. These directors have served on the GoodRx Board together for close to a decade, and in the case of Hirsch and Bezdek, since GoodRx's inception in 2011.

125.    Deb authorized the 2023 and 2024 Proxy Statements containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

126.    Deb benefitted from the violation of Section 14(a) of the Exchange Act pled herein by securing re-election to the GoodRx Board through the false and misleading statements and material omissions in the 2023 Proxy Statement.

127.    Defendants Deb and Adams have a long-standing business relationship which precludes them from acting with the required independence and disinterest with respect to considering whether to institute lawsuits against each other. Adams is a Partner at Francisco Partners, where he has served since August 2008. Defendant Deb is a co-founder of Francisco Partners and has served as the Managing Partner and Chief Executive Officer of Francisco Partners since September 2005. Deb has also served as a Partner of Francisco Partners since its founding in August 1999. Francisco Partners and its affiliates control 24.1% of the Company's voting power as of April 8, 2024. Both Deb and Adams were designated to the Board by Francisco Partners.

128.    Deb, as a director of GoodRx, was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing GoodRx's core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects; (2) effectively oversee and monitor the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls.

129.    Deb is neither independent nor disinterested. Any demand upon Defendant Deb is futile and, thus, excused.

**F.  Demand Upon Defendant Mondre Is Excused**

130.    Mondre authorized the 2023 and 2024 Proxy Statements containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

131.    Mondre benefitted from the violation of Section 14(a) of the Exchange Act pled herein by securing re-election to the GoodRx Board through the false and misleading statements and material omissions in the 2023 Proxy Statement.

132.    Defendants Mondre and Karol, and Director Simone Patterson have a long-standing business relationship which precludes them from acting with independence and disinterest with respect to considering whether to institute lawsuits against each other. Mondre is Co-Chief Executive Officer and Managing Partner at Silver Lake. He joined Silver Lake in 1999 and most recently served as a Managing Partner and Managing Director of the firm from January 2013 to December 2019. Karol was a Managing Director at Silver Lake until he resigned in April 2024. He joined Silver Lake in 2009 as a Principal and then served as a Director from 2013 to December 2018 prior to becoming Managing Director. Patterson is also a Managing Director at Silver Lake since 2005. Silver Lake and its affiliates control 43.5% of the Company's voting power as of April 8, 2024, and designated Mondre, Karol, and Patterson to serve on the Board.

133.    According to the 2024 Proxy Statement, GoodRx has a service agreement with Silver Lake Management Company V, L.L.C. ("SLMC"), a subsidiary of Silver Lake, and granted SLMC a license to use GoodRx's trademarks and logos:

> In October 2018, we entered into a services agreement with [SLMC]. Under the agreement, SLMC has provided from time to time, and may continue to provide, us and/or our affiliates, by and through itself and its affiliates, each as an independent contractor, certain monitoring, advisory and consulting services, among others. Pursuant to the agreement, we also granted SLMC a non-exclusive license to use our trademarks and logos in connection with describing SLMC's relationship with us. The amounts paid to SLMC and its affiliates under the agreement have not exceeded $120,000 since January 1, 2023.

134.    Defendant Mondre and Karol both serve on the board of directors of A Place For Mom, Inc. since July 2017. Silver Lake made a sizeable investment in the company and appointed Mondre and Karol to the company's board of directors.

135.    Mondre, as a director of GoodRx, was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing GoodRx's core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects; (2) effectively oversee and monitor the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls.

136.    Mondre is neither independent nor disinterested. Any demand upon Defendant Mondre is futile and, thus, excused.

**G. Demand Upon Defendant Rey-Giraud Is Excused**

137.    Defendant Rey-Giraud had a powerful incentive to inflate GoodRx's stock price through false and misleading financial information in order to profit from insider sales. Defendant Rey-Giraud sold 129,370 GoodRx shares while in possession of material adverse non-public information, reaping proceeds of $5,294,565. Thus, through the material misrepresentations and omissions regarding GoodRx's financial condition, Rey-Giraud reaped a material personal benefit not shared with other GoodRx stockholders from the misconduct pled herein.

138.    Defendants Hirsch, Bezdek, Adams, Deb, and Rey-Giraud have a long-standing business relationship which precludes them from acting with the required independence and disinterest with respect to considering whether to institute lawsuits against each other. These directors have served on the GoodRx Board together for close to a decade, and in the case of Hirsch and Bezdek, since GoodRx's inception in 2011.

139.    Rey-Giraud authorized the 2023 and 2024 Proxy Statements containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

140.    Rey-Giraud benefitted from the violation of Section 14(a) of the Exchange Act pled herein by securing re-election to the GoodRx Board through the false and misleading statements and material omissions in the 2024 Proxy Statement.

141.    Defendant Rey-Giraud was nominated to the Board through the Stockholders Agreement by Silver Lake, where Defendant Mondre is Co-Chief Executive Officer and Managing Partner. As such, Rey-Giraud is precluded from acting with the required independence and disinterest with respect to considering whether to institute a lawsuit against Defendant Mondre.

142.    Rey-Giraud, as a member of the Audit and Risk Committee, had duties regarding oversight of the risks facing the Company and GoodRx's compliance with relevant laws, rules, and regulations. Rey-Giraud utterly failed to perform these essential duties.

143.    Rey-Giraud, as a director of GoodRx, was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing GoodRx's core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects; (2) effectively oversee and monitor the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls.

144.    Rey-Giraud is neither independent nor disinterested. Any demand upon Defendant Rey Giraud is futile and, thus, excused.

**H.  Demand Upon Defendant Kennedy Is Excused**

145.    Kennedy authorized the 2024 Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

146.    Kennedy was nominated to the Board through the Stockholders Agreement by Silver Lake, where Defendant Mondre is Co-Chief Executive Officer and Managing Partner. As such, Kennedy is precluded from acting with the required independence and disinterest with respect to considering whether to institute a lawsuit against Defendant Mondre.

147.    Kennedy is neither independent nor disinterested. Any demand upon Defendant Kennedy is futile and, thus, excused.

**I.    Demand Upon Director Simon Patterson Is Excused**

148.    Director Simone Patterson and Defendants Mondre and Karol have a long-standing business relationship which precludes them from acting with independence and disinterest with respect to considering whether to institute lawsuits against each other. Mondre is Co-Chief Executive Officer and Managing Partner at Silver Lake. He joined Silver Lake in 1999 and most recently served as a Managing Partner and Managing Director of the firm from January 2013 to December 2019. Karol was a Managing Director at Silver Lake until he resigned in April 2024. He joined Silver Lake in 2009 as a Principal and then served as a Director from 2013 to December 2018 prior to becoming Managing Director. Patterson is also a Managing Director at Silver Lake since 2005. Silver Lake and its affiliates control 43.5% of the Company's voting power as of April 8, 2024, and designated Mondre, Karol, and Patterson to serve on the Board.

149.    According to the 2024 Proxy Statement, GoodRx has a service agreement with SLMC, a subsidiary of Silver Lake, and granted SLMC a license to use GoodRx's trademarks and logos:

> In October 2018, we entered into a services agreement with [SLMC]. Under the agreement, SLMC has provided from time to time, and may continue to provide, us and/or our affiliates, by and through itself and its affiliates, each as an independent contractor, certain monitoring, advisory and consulting services, among others. Pursuant to the agreement, we also granted SLMC a non-exclusive license to use our trademarks and logos in connection with describing SLMC's relationship with us. The amounts paid to SLMC and its affiliates under the agreement have not exceeded $120,000 since January 1, 2023.

**J.    Other Factors Demonstrating That Demand Upon The GoodRx Board Is Excused**

150.    GoodRx has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Board has not caused the Company to take action to recover for the Company the damages it has suffered and will continue to suffer thereby.

151.    The members of the GoodRx Board received, and continue to receive, substantial salaries, bonuses, payments, benefits, and other emoluments by virtue of their membership on the

Board. They have thus benefited from the wrongs alleged herein and have engaged therein to preserve their positions of control and the perquisites thereof and are incapable of exercising independent objective judgment in deciding whether to bring this action.

152.    Publicly traded companies, such as GoodRx, typically carry director & officer liability insurance from which the Company could potentially recover some or all its losses. However, such insurance typically contains an "insured vs. insured" disclaimer that will foreclose a recovery from the insurers if the Individual Defendants sue each other to recover GoodRx's damages.

## VII.    CLAIMS FOR RELIEF

### COUNT ONE
### Against the Individual Defendants for
### Violations of Section 14(A) of the Exchange Act

153.    Plaintiff incorporates by reference and realleges each and every allegation set forth above as if fully set forth herein.

154.    The Section 14(a) claim alleged herein is based solely on negligence.  It is not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. Section 14(a) claim alleged herein does not allege and does not sound in fraud. Plaintiff specifically disclaims any allegations of reliance upon any allegation of, or reference to, any allegation of fraud, scienter, or recklessness with regard to those non-fraud claims.

155.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

156.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to

state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

157.    Under the direction of the Individual Defendants, the 2023 and 2024 Proxy Statements failed to disclose that the Individual Defendants each violated their fiduciary duties to GoodRx and its stockholders by, among other things, failing to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing GoodRx's core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects; (2) effectively oversee and monitor the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls.  Further, the 2023 and 2024 Proxy Statements contained false and misleading statements related to risk and corporate governance oversight by the Board and the Audit and Risk Committee.

158.    In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2023 and 2024 Proxy Statements were materially false and misleading and omitted material information.

159.    The false and misleading statements in, and information omitted from, the 2023 and 2024 Proxy Statements was material to GoodRx's shareholders in determining whether to, among other things, elect Defendants Bradley, Deb, Hirsch, LeSieur, Mondre, and Rey-Giraud to the Board and approve executive compensation.

160.    The material misstatements and omissions in the 2023 and 2024 Proxy Statements damaged the Company.

161.    Plaintiff, on behalf of GoodRx, seeks relief for damages inflicted upon the Company based on the misleading 2023 and 2024 Proxy Statements in connection with the improper election of Defendants Bradley, Deb, Hirsch, LeSieur, Mondre, and Rey-Giraud and the approval of executive compensation.

COUNT TWO
Against the Individual Defendants for
Violations of Section 10(b) and Rule 10b-5 of the Exchange Act

162.    Plaintiff incorporates by reference and realleges each allegation contained above, as though fully set forth herein.

163.    This Count is asserted on behalf of the Company against the Individual Defendants for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

164.    At all relevant times, in connection with GoodRx's repurchases of its shares, the Individual Defendants made, disseminated, or approved false and misleading statements about the Company, omitting material information specified herein, which they knew or deliberately disregarded as false, misleading, or incomplete, intending to deceive, manipulate, or defraud. These false, misleading, or incomplete statements and Defendants' course of conduct were designed to artificially inflate the price of the Company's common stock.

165.    At the same time that the price of the Company's Class A common stock was inflated due to the false, misleading, or incomplete statements, Defendants caused the Company to repurchase millions of shares of its stock at prices artificially inflated by those statements. They engaged in a scheme to defraud the Company by causing it to repurchase shares at inflated prices.

166.    The Individual Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 by (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material facts or omitting material facts necessary to make the statements not misleading, given the circumstances; and/or (c) engaging in acts, practices, and a course of business that operated as a fraud or deceit upon the Company in connection with its purchases of GoodRx common stock.

167.    The Individual Defendants, directly and indirectly, used means or instrumentalities of interstate commerce and/or the U.S. mails, participating in a continuous course of conduct that operated as a fraud and deceit upon the Company. They made or disseminated various false and/or misleading statements of material facts and omitted material facts necessary to make their statements

not misleading, acted with intentional or reckless disregard for the truth, and employed devices and artifices to defraud in connection with the Company's purchase of GoodRx Class A common stock, deceiving the Company regarding its performance and internal controls.

168.    As directors and officers, the Individual Defendants were directly responsible for and are liable for all materially false, misleading, or incomplete statements made during the relevant times.

169.    The Individual Defendants acted with scienter, either intending to deceive, manipulate, or defraud, or with severe recklessness. The misstatements and omissions of material facts set forth herein were either known to Defendants or were so significant that they should have been aware of them.

170.    As a result of the Individual Defendants' misconduct, GoodRx suffered damages by paying artificially inflated prices for GoodRx Class A common stock and incurred losses when the true facts became known. The Company would not have purchased GoodRx Class A common stock at the prices it paid, or at all, but for the artificial inflation caused by the Individual Defendants' false, misleading, or incomplete statements.

171.    As a direct and proximate result of the Individual Defendants' wrongful conduct, the Company suffered damages related to its repurchases of GoodRx Class A common stock during the time period alleged. Therefore, the Individual Defendants are liable to the Company pursuant to Section 10(b) of the Exchange Act and SEC Rule 10b-5.

172.    Plaintiff brought this claim within two years of discovering the facts constituting the violation and within five years of the violation.

COUNT THREE
Against the Individual Defendants
for Breach of Fiduciary Duties

173.    Plaintiff incorporates by reference and realleges each allegation contained above, as though fully set forth herein.

174.    The Individual Defendants owed and owe fiduciary duties to GoodRx. By reason of their fiduciary relationships, the Individual Defendants specifically owed and owe GoodRx the highest obligation of good faith and loyalty in the administration of GoodRx's affairs. The Board also had specific fiduciary duties as defined by the Company's corporate governance documents and principles that, had they been discharged in accordance with the Board's obligations, would have prevented the misconduct and consequential harm to GoodRx alleged herein.

175.    The Individual Defendants ignored their obligations under state and federal law.  The Individual Defendants failed to make a good faith effort to correct the problems or prevent their recurrence.

176.    The Individual Defendants each violated their fiduciary duties to GoodRx and its stockholders by, among other things, failing to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing GoodRx's core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects; (2) effectively oversee and monitor the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, GoodRx has sustained and continues to sustain significant damages, and its reputation has been irreparably damaged.

177.    The Individual Defendants further breached their fiduciary duties to GoodRx by, inter alia, making or allowing the dissemination of false and misleading statements and material omissions in public statements and regulatory filings.

178.    As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, GoodRx has sustained significant damages, not only monetarily, but also to its corporate image and goodwill. Such damages include, among other things, the costs of defending and resolving the pending Securities Class Action.

179.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

### COUNT FOUR
**Against the Individual Defendants for
Contribution Under Section 21D of the Exchange Act**

180.    The conduct of the Individual Defendants, as described herein, has exposed the Company to significant liability under the federal securities laws.

181.    GoodRx is named as a defendant in a related securities class action lawsuit that alleges and asserts claims arising under the federal securities laws. The Company is alleged to be liable to private persons, entities and/or classes by virtue of many of the same facts alleged herein. If GoodRx is found liable for violating the federal securities laws, the Company's liability will arise in whole or in part from the intentional, knowing, or reckless acts or omissions of all or some of the Individual Defendants as alleged herein, who have caused the Company to suffer substantial harm through their misconduct. The Company is entitled to contribution and indemnification from the Individual Defendants in connection with all claims that have been, are, or may be asserted against the Company by virtue of their wrongdoing.

182.    As officers and directors, the Individual Defendants had the power or ability to, and did, control or influence, either directly or indirectly, GoodRx's general affairs, including the content of its public statements, and had the power or ability to directly or indirectly control or influence the specific corporate statements and conduct that violated the federal securities laws.

183.    The Individual Defendants are liable under § 21D of the Exchange Act, which governs the application of any private right of action for contribution asserted pursuant to the federal securities laws.

184.    The Individual Defendants have damaged the Company and are liable to the Company for contribution.

### COUNT FIVE
**Against the Individual Defendants
for Aiding and Abetting**

185.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

186.     Each of the Individual Defendants has acted and is acting with knowledge of or with reckless, or grossly negligent, disregard to the fact that the Individual Defendants are in breach of their duties to the Company and have participated in such breaches of duties.

187.     In committing the wrongful acts, each of the Individual Defendants has pursued or joined in the pursuit of a common course of conduct.  They have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to pursuing the wrongful conduct that gives rise to their primary liability, the Individual Defendants also aided and abetted, and/or assisted, each other in breaching their respective duties.

188.     Because the actions described herein occurred under the Board's supervision and authority, each of the Individual Defendants played a direct, necessary, and substantial part in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

189.     Each of the Individual Defendants aided and abetted each other and rendered substantial assistance in the wrongs complained of herein.

## COUNT SIX
### Derivative *Brophy* Claim Against
### The Insider Seller Defendants

190.     Plaintiff repeats and realleges each and every allegation above as if set forth in full herein.

191.     As directors and officers of GoodRx, the Insider Seller Defendants owed fiduciary duties of loyalty and good faith to the Company.

192.     The Insider Seller Defendants sold GoodRx stock while in possession of material nonpublic information that artificially inflated the price of GoodRx stock.

193.     By selling GoodRx stock while in the possession of material adverse nonpublic information that artificially inflated the price of GoodRx stock, the Insider Seller Defendants exploited their positions at GoodRx and breached their fiduciary duties to GoodRx. The Insider Seller

44

Defendants improperly benefited from their breaches of fiduciary duty and are liable to GoodRx for their benefit therefrom.

194.    Plaintiff, on behalf of GoodRx, has no adequate remedy at law.

**COUNT SEVEN**
**Derivative Claim for Unjust Enrichment Against**
**The Individual Defendants**

195.    Plaintiff repeats and realleges each and every allegation above as if set forth in full herein.

196.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of GoodRx, as a result of their compensation and director remuneration and the proceeds which they received as a result of their misstatements and material omissions, while breaching fiduciary duties owed to GoodRx.

197.    Further, the Insider Seller Defendants sold GoodRx stock while in possession of material nonpublic information that artificially inflated the price of GoodRx stock. As a result, the Insider Seller Defendants profited from their misconduct and were unjustly enriched through their exploitation of material and adverse inside information

198.    Plaintiff, as a stockholder and representative of GoodRx, seek on behalf of the Company an order of this Court ordering the Individual Defendants to disgorge and furnish restitution to GoodRx of all profits, benefits, and other compensation obtained by them for their wrongful conduct and fiduciary breaches.

199.    Plaintiff, on behalf of GoodRx, has no adequate remedy at law.

**VIII.    PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of GoodRx and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants violated Sections 14(a), 10(b), and 21D of the Exchange Act and the related Rules promulgated thereunder;

(c)   Declaring that the Individual Defendants have breached and aided and abetted the breach of their fiduciary duties to GoodRx;

(d)   Directing the Company to take all necessary actions to implement and maintain an effective system of internal controls and meaningful Board oversight;

(e)   Determining and awarding to GoodRx the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(f)   Ordering disgorgement of profits, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties;

(g)   Ordering the Insider Seller Defendants to disgorge and pay to the Company all profits, benefits, and other compensation obtained by their insider trading and breaches of fiduciary duties;

(h)   Awarding GoodRx restitution from the Individual Defendants, and each of them;

(i)   Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys', consultants' and experts' fees, costs, and expenses; and

(j)   Granting such other and further relief as the Court may deem just and proper.

## IX.   JURY DEMAND

Plaintiff hereby demands a trial by jury in this action of all issues so triable.

Dated: November 6, 2024

**OF COUNSEL:**

**WEISS LAW**
David C. Katz
Mark D. Smilow
305 Broadway, 7th Fl.
New York, NY 10007
Telephone: (212) 682-3025
Facsimile: (212) 682-3010
Email: dkatz@weisslawllp.com
        msmilow@weisslawllp.com

Joshua M. Rubin
Jonathan Meer
4 Brighton Rd., Ste. 204
Clifton, NJ 07014
Email: jrubin@weisslawllp.com
        jmeer@weisslawllp.com

**WEISS LAW**

By:    */s/ Joel E. Elkins*

Joel E. Elkins
611 Wilshire Blvd., Suite 808
Los Angeles, CA 90017
Telephone:  310/208-2800
Facsimile:  310/209-2348

*Attorneys for Plaintiff Stephen Bushansky*